EZRA MINOR *vs.* JOSEPH H. SHARON.
EZRA MINOR, JR., *vs.* SAME.
AGNES MINOR *vs.* SAME.

The owner of a dwelling-house, who, knowing that it is so infected with the small-pox as to endanger the health of the occupants, leases it, for the purposes of habitation, without disclosing the fact, to one who is ignorant of its condition and who, without contributory negligence on his part, by reason of the state of the house, is attacked by the disease, is liable to an action.

In an action by the lessee of a dwelling-house against the lessor, for letting the house, knowing that it was infected with the small-pox, without disclosing that fact, the lessee having taken the disease from the infected house, the question whether vaccination would, under all the circumstances of the case, have been a proper precaution for the lessee to have taken, is for the jury.

ACTIONS OF TORT, which, by consent, were tried together in the Superior Court, before *Dewey,* J.

The declaration in the first action contained five counts. The fifth, which is sufficient to show the cause of action, was as follows:

" The plaintiff says the defendant let to him a tenement **in** which to reside, in which the defendant knew had occurred cases of the small-pox, and that the same was tainted with the said disease, and was dangerous, and the defendant was bound to inform the plaintiff of the same, so that precautions might be taken, and to take himself reasonable precaution against the exposure of the plaintiff to said disease; but the defendant carelessly and negligently omitted to inform the plaintiff or to take any precaution against the exposure of the plaintiff to the said disease, and the plaintiff, using the said house, was made sick with the said disease."

The plaintiffs in the other actions were minor children of Ezra Minor, and the declaration in each case alleged that the minor was a member of the father's family, and while residing with him was made sick by the small-pox.

The plaintiff, Ezra Minor, testified that he came to Holyoke from Canada, with his family, consisting of his wife and eight children, the oldest of whom was seventeen years of age ; that they arrived at Holyoke May 5, 1871, and on the day following applied to the defendant for a tenement in his block. " I asked him if he had a tenement. He said ' Yes.' Said it was $9 per month. Said I would find the keys with a family in the block. I found them. There were three rooms. I told him that I found them dirty. He said I must clean them. I told him I would take them. I told him I wanted the tenement for my family. I said I had eight children ; he remarked that was a good many. We washed the floors before we moved in, and scrubbed the paint and windows, and tried to get the place clean. Ours was the south tenement on the second floor. There were three floors and a basement, making fourteen tenements in the block. We occupied two rooms to sleep in, and one for a kitchen. One of my family had the small-pox about May 30 ; this was Agnes, who was five years old. All the eight children had it. I had symptoms of it. My wife had had it before. Two of my children came down the same day ; and about six days after, my son was taken ill. The others came down in eleven days. I was the last to come down. I did not know there had been small-pox in the

tenement. Nothing was said about it. I had not been exposed, to my knowledge. We had Dr. Evans. I saw from the walls there had been no whitewashing or recent cleaning. I was put to expense, and I had myself and all of my children vaccinated on the 13th day of May."

Upon the cross-examination he said: "I went into the tenement the next day after I got to Holyoke. I commenced to look for a tenement the afternoon I got there. Went into no other house to look for a tenement. I called at a house below where these rooms were. Went into that. Was there two hours. Mr. Mosiure was the name of the man who occupied it. My family stayed there until we went to the plaintiff's house. We remained at Mr. Sharon's until November 6. I went alone to Sharon's store. Was told where the store was. I have a cousin in Holyoke, named Antonio Minor. He lived in a block below Sharon's, say thirty-five or forty feet below. I do not remember as he went with me to the store. When I got to Holyoke, I went to my cousin's with the express wagon. The expressman went up for him. He came down. Said there was not room for me in his tenement; that Sharon had one. He told me that the folks he lived with had had the small-pox in the winter. The folks in the block he lived in had had it, and he mentioned it so that we might go to the Samoset House. I did not go into his tenement. I made no further inquiries about the small-pox. The block my cousin lived in also belonged to Sharon. My cousin was a widower. I saw him from time to time. My children went out once into the next block after we moved into this tenement. They had not been vaccinated before May 13. I knew, after I arrived in Holyoke, that there had been small-pox in the town. I asked no questions. I went to the Samoset House, because my cousin's tenement was small, and there had been small-pox there. I did not ask if there had been much small-pox. I heard that there had been small-pox in that building, after I moved in, and had been there some days. I had Mr. Le Franc vaccinate them. He is not a physician. The vaccination did not take. I did not move out of the building. I did not know that there had been any small-pox in my room. I did not whitewash. Sharon

said there was a whitewash brush somewhere in the building. I looked for it, but did not find it, and made no effort to get one. I inquired for this about the 10th or 12th of May. Mr. Roberts spoke to me about the small-pox. He was talking about the death of one of his children. He lived in the same block, on the same floor. He said his child died April 8. No one of his family was sick at this time. He told me about the 10th of May, a week or ten days after I moved in. We did not occupy any other tenement until my children were sick. They went into the adjoining vacant rooms to play. I don't know but Le Franc vaccinated my children with regular small-pox. I called at a Mrs Sharon's for something for vaccination. I heard that other children went there for vaccine matter. I do not know what she gave me. I vaccinated my children with that. Le Franc used it. He told me that he was used to vaccinating children. No one was sick in the block when I lived there. There were nine or ten other families in that block. No one came down before my children. Three of my children worked in the mills. All the other families in that block had children. I did not see the vaccination matter given by Mrs. Sharon. I saw Le Franc mix it up, take a razor, scrape the skin to the blood, and apply it. When I heard small-pox had been in the building, I went to Sharon and asked him to whitewash, but he refused; said I must do it myself."

It was agreed, that in the block referred to there was a common stairway and passage leading to the four tenements on the second floor, one of which was occupied by the defendant. It was also in evidence that whitewashing had a tendency to prevent infection.

Ezra Minor, Jr., testified as follows: " I went into the tenement May 6. I am a harness maker, and went to work at once after coming to Holyoke. I went nowhere, where they had small-pox. I was a stranger. Le Franc vaccinated us. Did not see what he had. It was mixed. This was in the evening. Had not heard that there was any small-pox before. I heard after I had been there two weeks."

Upon the cross-examination he said: " I was vaccinated three weeks after I had been in the house. Had small-pox about a

week after.  My father's cousin lived next block, thirty or forty feet from ours.  Learned that we had a cousin in Holyoke after we got there.  Got acquainted with him.  Heard of him after we were taken down.  When we came to my cousin's the first time, I heard nothing about the small-pox.  I did not know as there was any small-pox round.  I did not go into any other house.  On Sunday I went to church in the morning.  The rest of the day I remained at home."

Dr. Godon, of Holyoke, called by the plaintiff, testified as follows : " I have been a physician for twelve years.  I attended the Minor family in May, 1871.  Found two sick with the small-pox ; one Agnes, and the other the baby in the cradle, and all of them had it in turn.  They were very sick, one of them I was afraid would die.  I knew that there was small-pox in this building before ; in all the rooms in that passage way but those occupied by Minor.  Probably had been there a couple of months before, in the families of Mr. Roberts, Mr. Le Duke, and a Mr. Le Fredo.  The house is fifty feet long.  In going to Minor's rooms, you had to pass Roberts's door.  I regard small-pox as contagious.  There are no doubts about its being communicated from tenement to tenement.  It can be carried in the clothing, and so from tenement to tenement.  I had two hundred cases in Holyoke.  Persons come down with it between nine and fourteen days from time of exposure, I cannot account for the Minors' not coming down sooner, unless from their not coming in contact with currents of air from the infected tenements.  I am nearly sure that Sharon knew there had been small-pox in that building. I told him that the contagion was not kept down, in consequence of the uncleanness in the town.  He said the town was to look to that.  This was in the winter.  When Roberts's child was sick with small-pox in the building, I told Sharon of it.  The child died April 8."

Upon the cross-examination he said :  " There was a great deal of small-pox in Holyoke.  It was in all the families and blocks about there.  There is some dispute whether it is epidemic or infectious.  I think small-pox passes from room to room, and from house to house.  At that time it was pretty hard to tell where a

man got it. He was as likely to get it in one place as another; as likely to get it from meeting a person who had it, as by catching it from a room. Cases occurred, and no finite mind could tell where the patient caught it. Every man in Holyoke was exposed to it. If Minor's family had been vaccinated, they would probably have escaped it; but vaccination is not a sure preventive. They would not have had it severely, and only a few spots on their faces. The pitted spots generally pass off from the faces of young people. I do not consider it prudent for persons to vaccinate, who have had no experience. If the vaccine matter is not well kept, it won't work. When the vaccine matter is taken from a family who have had the small-pox, there is danger in getting the wrong scab and communicating the small-pox. I think there were more chances for the family to take the small-pox by going into the vacant tenement. If the children were in the habit of playing in the unoccupied tenement, they might have taken it there. This block was dirtier than some, and not as much so as others. Some of this class of tenants are very dirty. I practise mostly among the French and Irish people. The two blocks spoken of are almost together. They are thirty or forty feet apart."

In answer to the plaintiff, he further testified: "It is easy to be deceived in the vaccine matter. Can't tell good from bad by looks. The operation of vaccination is easy. Cleansing tends to prevent small-pox. Where there has been small-pox, the place should be ventilated, whitewashed, and carbolic acid used. If a person was coming down with the small-pox, vaccination would not be of much help. The small-pox would show first."

Dr. Calkins, a physician of Springfield, was called as an expert, and testified in substance: "That the small-pox was the most infectious of all diseases. Carpets on a room where there had been a case of small-pox, would hold the infection several months. Persons usually come down in fourteen days after exposure. Sometimes not until twenty days. It may not be taken on the first exposure. If the carpets are removed, it may be caught from drafts of air. Carpets should be removed, and carbolic acid used to destroy the infection. The operation of vaccination is

not difficult. It can be performed by a physician better than by other persons, but a physician may be deceived in the vaccine matter. This is common. Inoculation developes small-pox, but not confluent small-pox. Agnes and Ezra had confluent small-pox."

Upon the cross-examination he said : " If there were carpets and furniture in a room where a person had been sick with the small-pox, the infection might remain two months. One exposure is as good as a hundred. A tenement would retain the infection of small-pox for two months."

W. A. Judd, one of the selectmen of Holyoke, and the agent of the board of health, called by the plaintiffs, testified : " In the last four years, I have had to deal with four hundred and eighty cases of the small-pox. I buried a case from Mr. Roberts's family, who lived across the space from Mr. Minor's, April 8th, 1871. After that I went to defendant's store, told him there had been a death from small-pox there, and requested him to wash, and slack-lime his tenement. Afterwards saw it when the Minors lived there, and it did not bear the appearance of being cleansed."

Augustus Roberts testified for the plaintiffs : " I lived in the tenement opposite the one occupied by Minor. Mr. Le Duke had moved into a tenement in the same passage in the block, whose child was sick at that time with the small-pox. My child took it from theirs. Was sick two months, and died April 8th, 1871. I told the defendant that the small-pox was in my house, and that I was reproached for not cleaning the place as it should be. He made no reply."

Upon the cross-examination he said : " I was acquainted with Minor when we both lived in Canada. I saw him the day after he moved into his premises. I had no conversation with him about the small-pox, and did not tell him my daughter had died with it, until after his children were sick. The plaintiff and I visited back and forth, and so did our children."

In defence, the defendant testified, that he did not know of the existence of small-pox in his block, until he was informed of the illness of Minor's children. Other witnesses were called to show in what way Minor and his children had been exposed to take this disease in other places than in the defendant's tenement.

After the testimony was finished, the defendant asked the court to rule as follows:

"1st. That upon all the evidence in the case the plaintiff cannot recover.

"2d. That if the jury are satisfied from the evidence in the case, that the plaintiff Ezra Minor did not cause his children to be vaccinated within a reasonable time after he came with them into the Commonwealth, the minor plaintiffs cannot recover.

"3d. The mere failure on the part of the defendant to inform the plaintiff Ezra Minor that small-pox had been in the building, even if he knew it, there being no other concealment of it, would not render him liable.

"4th. That if the plaintiff Ezra Minor did not immediately, after being informed that there had been small-pox in the building, procure himself and family to be vaccinated by a competent person, he cannot recover.

"5th. That the minor plaintiffs cannot recover, unless they or their parents, if themselves too young, took all reasonable means to prevent contracting the disease. And the neglect to be vaccinated within a reasonable time would be such want of reasonable care.

"6th. That if the jury are satisfied, that if the plaintiffs had been vaccinated within a reasonable time after they ascertained that there had been small-pox in the building, they would not have had the disease, or if they had had it, it would have been less severe, then they can recover only for the amount of damage which they would have sustained if they had been so vaccinated."

The court refused to give either of these rulings, excepting the last, which he gave after striking out the words, "if the plaintiff had been," in the first part of the prayer, and inserting in the place thereof the words, "the plaintiff was in fault in not having himself and family." And also inserting the words, "and if they had been," before the clause, "they would not have had the disease."

The court instructed the jury as follows: "1st. If the owner of a tenement leases the same, to be occupied by the lessee and his family, the owner at the time having knowledge that the

tenement was so infected by the small-pox as to be unfit for occupation, and to endanger the health and lives of the occupants on account thereof, the lessee having no knowledge of said fact, and the lessor conceals his knowledge to induce the lessee to hire and occupy the same, and the lessee and his family, while in the occupation of the said tenement under said lease, on account of the said infection thereof, are taken sick, the lessee is entitled to recover the damages resulting to him from said sickness; but if the want of due care on the part of the plaintiff contributed to his taking the disease, he cannot recover. And the minor children are entitled to recover for the damages personal to themselves, as are stated, if the father exercised due care.

" 2d. That it was the plaintiff's duty to take all such precautions as a man of ordinary care and prudence would take under like circumstances.

" 3d. No specific rule can be laid down. The circumstances and facts known to the plaintiff must be considered, the extent of the disease, the opportunities and dangers of exposure.

" 4th. If vaccination was a proper precaution, it should have been attended to by the plaintiff, within a reasonable time after he had knowledge of danger of exposure. He should have employed a proper person, or one whom he had reasonable cause to believe was qualified to vaccinate his family.

" 5th. Whether he was in fault in not causing his family to be vaccinated, or in not procuring a proper person to vaccinate them, is for the jury. If they consider that a proper preventive, the jury will say whether, with a knowledge of the existing state of facts, the plaintiff unreasonably delayed, or employed an unsuitable person. If he did, he was in fault.

" 6th. If the children caught the disease in consequence of entering rooms not leased to the father, but separate and distinct from their tenement, the defendant is not liable."

The jury found for the plaintiff in each action; in the first for $325; in the second for $125; and in the third for $450; and the defendant excepted.

*G. Wells,* (*N. A. Leonard* with him,) for the defendant. The defendant made no representation as to the condition of the prem-

ises. There is nothing in the evidence which has any tendency to show that the plaintiff had any reason to suppose the tenement in any different condition from what it actually was. The plaintiff had the same means of ascertaining its condition that the defendant had, that is, by inquiring, and the defendant had no reason to suppose that he had not ascertained it. Under such a state of facts, the failure on the part of the defendant to disclose the defect, if there was one, is not such a deceit as would render him liable, and the court erred in not giving the third ruling asked for. *Keates* v. *Cadogan*, 10 C. B. 591. *Fleming* v. *Slocum*, 18 Johns. 403.

The court erred in refusing to give the second instruction asked, and in leaving it to the jury to determine whether vaccination was a proper precaution to avoid small-pox. That it is a necessary precaution is well settled by experience and universally admitted, and the law made it the plaintiff's duty to take it. Gen. Sts. *c.* 26, § 27. It was while the plaintiff and his family were in the condition in which by law they were forbidden to be, and by reason of their being in that condition, that they contracted the disease. The defendant had a right to presume that the plaintiff had conformed to the provision of the statute, and it was error for the court to leave it to the jury to determine whether it was the plaintiff's unlawful neglect or the defendant's act which caused the injury.

The injury complained of is not of such a nature as to give a right of action, and the court should have ruled that the plaintiff could not recover. There is no precedent for such an action, and there ought to be none, because in diseases which are usually designated as contagious, the connection between the origin of the disease and the disease itself is not a matter cognizable by our senses. In any given case no one can tell, with any degree of certainty, how or where the disease was contracted, or from whence it originated. The knowledge of the wisest is merely a conjecture. We claim, therefore, that the source from which and the manner in which contagion is communicated is too uncertain and unsusceptible of proof to form the foundation for an action If the defendant is liable in these actions, then whoever, in the

opinion of a jury, negligently exposes others to a contagious disease of any kind, is liable to all damages which may result from such exposure; a doctrine which will open an endless field of litigation, and establish such liabilities as it will be practically impossible to guard against.

*G. M. Stearns*, (*M. P. Knowlton* with him,) for the plaintiff.

.MORTON, J. It must be assumed that the jury found, under the instructions given them, that the defendant, being the owner of a tenement, knowing that it was so infected by the small-pox as to be unfit for occupation and to endanger the health and lives of the occupants, and concealing this knowledge from the plaintiff to induce him to hire it, leased it to the plaintiff; that the plaintiff and his children took the disease by reason of the infection of the tenement; that the plaintiff was ignorant of its dangerous condition, and that no negligence of his contributed to their taking the disease. Upon these facts the defendant is guilty of actionable negligence, and is liable for whatever injury the plaintiff has sustained by reason thereof.

In *Sweeny* v. *Old Colony & Newport Railroad Co.* 10 Allen, 368, 372, the rule is stated to be, that " in order to maintain an action for an injury to person or property by reason of negligence or want of due care, there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests." Negligence consists in doing or omitting to do an act in violation of a legal duty or obligation. In this case the defendant knew that the tenement was so infected as to endanger the health and life of any person who might occupy it. It was a plain duty of humanity on his part to inform the plaintiff of this fact, or to refrain from leasing it until he had used proper means to disinfect it. If the defendant had invited any person to enter his tenement, knowing that there was a dangerous obstruction or pitfall in it, he would be liable; the negligence was no less gross because the danger was a secret one which could not be detected by inspection or examination. *Carleton* v. *Franconia Iron & Steel Co.* 99 Mass. 216. *French* v. *Vining*, 102 Mass. 132.

The defendant contends that the injury complained of is not of such a nature as to give a right of action, " because in diseases which are usually designated as contagious, the connection between the origin of the disease and the disease itself is not a matter cognizable by our senses," and " the source from which and the manner in which contagion is communicated is too uncertain and unsusceptible of proof to form the foundation for an action." In the trial of cases, as in the ordinary affairs of life, it is often impossible to establish the connection between cause and effect with absolute certainty. But evidence which produces a moral conviction is sufficient. It is upon such convictions that men act in the important concerns of life, and no greater certainty is required or attainable in the administration of the law. The defendant's negligence was an adequate cause of the injury to the plaintiff. The evidence reasonably satisfied the minds of the jury that it was the operating cause, and the defendant cannot escape the consequences of his negligence upon the plea that the connection between cause and effect cannot be proved beyond possibility of doubt.

The defendant also contends that the presiding judge erred in declining to instruct the jury that if the plaintiff Ezra Minor did not cause his children to be vaccinated within a reasonable time after he came with them into the Commonwealth, the minor plaintiffs could not recover. Upon this subject, the judge instructed the jury that it was the duty of the plaintiff to " take all such precautions as a man of ordinary care and prudence would take under like circumstances; " that it was for the jury to say whether vaccination was a proper precaution, and if so, whether he procured his children to be vaccinated within a reasonable time and by a suitable person. These instructions were sufficient. We cannot say, as matter of law, that under all circumstances vaccination is a necessary precaution to be taken by a person exposed to the small-pox. It is a question of fact, and was properly left to the jury. The argument of the defendant that the plaintiff, in neglecting to have his children vaccinated, was guilty of a violation of law, has no foundation in the facts of the case. He caused them to be vaccinated eight

days after he arrived in this country, and it does not appear that he was guilty of any violation of the statute. Gen. Sts. *c.* 26, § 27.

Upon the whole case we are of opinion, that, upon the facts found by the jury, the plaintiffs are entitled to recover, and that the instructions given at the trial were sufficiently favorable to the defendant. *Exceptions overruled.*